IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 6, 2025 Session

## SAP AMERICA, INC. v. DAVID GERREGANO, COMMISSIONER OF REVENUE, STATE OF TENNESSEE

Appeal from the Chancery Court for Davidson County
No. 20-1249-II      Anne C. Martin, Chancellor

_____

### No. M2024-01399-COA-R3-CV

_____

The Tennessee Department of Revenue issued a business tax assessment against a company based on the company's gross receipts from sales of computer software, cloud hosting, and cloud-based services. The company challenged the assessment by filing a complaint in the chancery court. Both parties filed motions for summary judgment. The court granted summary judgment to the company, finding that the sales of computer software and cloud hosting were not subject to business tax. The court upheld the Tennessee Department of Revenue's assessment of business tax against the company's sales of cloud-based services. Lastly, the court found that the company was the prevailing party and awarded the company attorney's fees pursuant to Tenn. Code Ann. § 67-1-1803(d). The Tennessee Department of Revenue appealed. Discerning that the court erred in its determination that the company's cloud hosting sales were not subject to business tax, we reverse that portion of the court's decision. Because this affects the attorney's fees award, we vacate the award of attorney's fees and remand for further proceedings. We affirm the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JEFFREY USMAN, J., joined.

Jonathan Skrmetti, Attorney General and Reporter, J. Matthew Rice, Solicitor General, and Mary Ellen Knack, Senior Assistant Attorney General, for the appellant, Commissioner of Revenue for the State of Tennessee.

Christopher A. Wilson, Michael A. Cottone, and G. Michael Yopp, Nashville, Tennessee, for the appellee, SAP America, Inc.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from a dispute over a business tax assessment issued for tax years 2014 through 2018. SAP America, Inc. ("SAP") is a Delaware corporation primarily engaged in the business of selling or licensing enterprise resource planning software ("enterprise software") developed by SAP or SAP affiliates. SAP's customers are businesses that use SAP's enterprise software to perform various tasks associated with managing business operations, including financial functions, human resources, procurement, expense payment, manufacturing, and retail. SAP offers two primary models for customers to purchase licenses to use SAP software: "On-Premise Software" and "Remotely Accessed Software." Under both models, SAP's customers purchase the right or license to use SAP's software. The sole difference between the two models is how SAP's customers choose to access its software. In other words, On-Premise Software and Remotely Accessed Software are the same product, differing only in how the product is deployed.

Under the On-Premise Software model, a customer purchases a license for a specific enterprise software application from SAP, and SAP provides the customer with a direct download link that allows the customer to download the software from SAP's servers and install it onto the customer's own computer or server. The Remotely Accessed Software model is often referred to as "Software as a Service," "SaaS," or "cloud computing." Regardless of the term used, under this model, a customer purchases a license for the right to use the internet to remotely access SAP software located on SAP's servers. SAP maintains no physical business location in Tennessee, and none of SAP's servers are located in Tennessee. Thus, none of SAP's customers download or access software from any servers in Tennessee.

Occasionally, SAP's customers will request to license software with functionalities that are not included with SAP's current software offerings. In those instances, SAP sometimes develops software to meet the customer's needs and then licenses the software to the customer. SAP retains ownership of the software after developing it and will often license the software to other customers seeking the same functionality. This type of software is referred to as Customer-Specific On-Premise Software. For all practical purposes, it is simply a type of On-Premise Software.

For customers that purchase a license to use its On-Premise Software, SAP offers the option to purchase on-going access to software updates, patches, and other fixes that "maintain" the software the customer has licensed from SAP to ensure that it continues performing as expected. The updates and patches consist of computer code and are computer software like the underlying programs to which they correspond. As with the On-

Premise Software, SAP's customers download the updates, patches, and other fixes from SAP's out-of-state servers.

If a customer who purchases software from SAP does not want to purchase and maintain its own data center to use the software, the customer may purchase a subscription to access SAP's Cloud Hosting. SAP's Cloud Hosting is sometimes referred to as "infrastructure as a service," "IaaS," "platform as a service," or "PaaS." It allows the customer to access SAP's servers or hardware infrastructure—none of which are located in Tennessee—so that the customer can deploy, manage, and run the software on SAP's hardware, or so the customer can gain access to processing, storage, or networking solutions using SAP's software platform. Under this arrangement, SAP manages the infrastructure accessed by the customer via the cloud.

For customers who elect to remotely access SAP's software via cloud technology or any other remote manner, SAP provides a variety of services referred to as "Cloud-Based Services." All of SAP's Cloud-Based Services are optional and include "Premium Cloud Subscription Support," "Ancillary Services" for remotely accessed software, "Online Training," and "Cloud Consulting Services." The Premium Cloud Subscription Support service provides some SAP customers with optional ongoing software support, such as patches and fixes, and with enhanced account support. With its Ancillary Services offering, SAP provides customers who purchase SAP's Remotely Accessed Software the option to purchase additional software services such as software configuration. SAP's Online Training offering allows customers to access training sessions through the internet. Lastly, SAP offers Cloud Consulting Services to its customers. This offering consists of software configuration, data conversion and migration, and related services provided remotely to SAP's customers.

The Tennessee Department of Revenue ("the Department") conducted a business tax audit of SAP for the period January 1, 2014, through December 31, 2018. After concluding the audit, the Department issued a Notice of Proposed Assessment on January 31, 2020, imposing business tax on gross receipts derived by SAP from software licensing, Cloud Hosting, and Cloud-Based Services. The total amount of business tax assessed to SAP was $728,080.51, including $485,061 in tax, $121,265.25 in interest, and $121,754.26 in penalty.

In the audit package, the Department determined that SAP was in the "business of selling computer software, cloud services, software consulting services, software programming services, configuration services, and training classes." The Department classified all of these activities as sales of services under Classification 3 of Tenn. Code Ann. § 67-4-708. For business tax purposes, the Department consults the Standard Industrial Classification ("SIC") Index to determine classifications for a business's activities. The SIC Index classifies computer software, whether prepackaged or custom, as business services. Because the SIC Index has been replaced by the North American

Industry Classification System ("NAICS"), the Department also consults the NAICS and crosschecks it with the SIC Index when determining classifications for a business's activities. In the audit package for SAP, the Department classified SAP under NAICS code 541511, Custom Computer Programming Services.

SAP requested an informal conference to dispute the proposed assessment. Following the informal conference, the Department's hearing officer issued a letter upholding the assessment after concluding that SAP's computer programming services were classified as business services by the SIC Index. SAP then filed a complaint in the Davidson County Chancery Court to challenge the assessment under Tenn. Code Ann. § 67-1-1801(a)(1)(B).[1] In its complaint, SAP challenged the assessment on three grounds: (1) that the Department improperly taxed SAP's sales of software as sales of services, (2) that the true object of SAP's Cloud Hosting sales was the nontaxable lease of tangible or intangible personal property located outside of Tennessee, and (3) that SAP's sales of Cloud-Based Services were not taxable because they were not delivered in Tennessee. The Department filed an answer and counterclaim seeking a judgment for the full amount of the assessment. Both parties requested an award of attorney's fees pursuant to Tenn. Code Ann. § 67-1-1803(d).[2]

The parties filed cross-motions for summary judgment and, in August 2023, the trial court entered an order granting summary judgment to SAP. In the order, the court concluded that SAP's gross receipts from software licensing—whether direct or via SaaS— were not subject to business tax because they constituted sales of intangible personal property. The court then found that the two remaining grounds raised by SAP were pretermitted and abated the entire business tax assessment. Upon the Department's motion to alter or amend, the trial court entered an order in November 2023 that addressed the grounds considered pretermitted in the August 2023 order. Specifically, addressing the second ground, the court found that the true object of SAP's Cloud Hosting sales was the lease of tangible personal property rather than the sale of services. Thus, the court concluded that those sales were not subject to business tax. Regarding the third ground, the trial court concluded that the Department properly assessed business tax on SAP's sales of Cloud-Based Services because they constituted sales of services that were delivered to locations in Tennessee. The court awarded the Department a judgment of $43,154.83, plus

---

[1] Pursuant to Tenn. Code Ann. § 67-1-1801(a)(1)(B), a taxpayer may challenge a final tax assessment by filing suit "against the commissioner [of revenue] in chancery court in the appropriate county in this state, challenging all or any portion of the final assessment of such tax, including any interest and penalty associated with the tax."

[2] Pursuant to Tenn. Code Ann. § 67-1-1803(d), "[t]he court shall award to the prevailing party reasonable attorneys' fees and expenses of litigation up to twenty percent (20%) of the amount finally assessed or denied, including interest after payment[.]"

interest and penalties, for the business tax assessed against SAP's sales of Cloud-Based Services.

In the November 2023 order, the trial court found SAP to be the prevailing party for purposes of awarding attorney's fees pursuant to Tenn. Code Ann. § 67-1-1803(d). SAP subsequently filed an application seeking $148,228.42 in attorney's fees calculated through February 1, 2024, plus $26.45 in additional daily fees to account for the continued accrual of interest after February 1. In calculating the requested fee amount, SAP applied the applicable twenty-percent fee cap under Tenn. Code Ann. § 67-1-1803(d) to the full tax, penalty, and interest abated by the trial court. The Department argued that SAP erred by including interest within the fee cap calculation. The trial court agreed with SAP's calculation and, on August 14, 2024, entered an order awarding SAP $148,228.42 in attorney's fees, plus $26.45 in additional daily fees accrued after February 1, 2024.

The Department timely appealed and presents three issues for our review: (1) whether the trial court erred in concluding that SAP's sales of software constituted sales of intangible personal property, (2) whether the trial court erred in concluding that SAP's Cloud Hosting sales constituted the lease of tangible personal property and not sales of services, and (3) if, the trial court properly granted summary judgment to SAP, whether the trial court erred in including interest in its calculation of the maximum attorney's fees that could be awarded to SAP under Tenn. Code Ann. § 67-1-1803(d). SAP raises the additional issue of whether the trial court erred in concluding that SAP's Cloud-Based Services sales were subject to business tax.

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must submit evidence either "affirmatively negating an essential element of the

nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin*, 271 S.W.3d at 83 (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

Determining whether summary judgment was appropriate in this case requires us to interpret statutes. When interpreting a statute, our role "is to assign a statute the full effect of the legislative intent without restricting or expanding its intended scope." *Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016). We determine the legislature's intent by "look[ing] first and foremost to the text of the statute because the statutory language is of primary importance." *Flade v. City of Shelbyville*, 699 S.W.3d 272, 285 (Tenn. 2024). If a statute's language is "clear and unambiguous, we derive the legislative intent from the plain meaning of the statutory language and simply enforce the statute as written." *Id.* Statutory construction presents a question of law that we review de novo without a presumption of correctness. *State v. Welch*, 595 S.W.3d 615, 621 (Tenn. 2020).

ANALYSIS

The Department assessed tax against SAP pursuant to Tenn. Code Ann. §§ 67-4-701 to -730 ("the Business Tax Act" or "the Act"). The Act allows the state to levy a tax on the privilege of engaging in certain types of business activities in this state. *See* Tenn. Code Ann. § 67-4-704(a). The Act sets forth various classifications for businesses, with a business's classification determining the rate and due date of the tax owed. Tenn. Code Ann. §§ 67-4-708, 67-4-709, 67-4-715. A business is classified according to its "dominant business activity," Tenn. Code Ann. § 67-4-708, which means "the business activity that is the major and principal source of taxable gross sales of the business." Tenn. Code Ann. § 67-4-702(a)(5).

The business classifications are located in Tenn. Code Ann. § 67-4-708. Each classification includes a list of the taxable activities under the Act. *Id.* Generally, the Act imposes a tax on the sales of certain types of tangible personal property and services. The Act defines "tangible personal property" as

- 6 -

personal property that may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses. "Tangible personal property" does not include stocks, bonds, notes, insurance or other obligations or securities, nor does it include any materials, substances or other items of any nature inserted or affixed to the human body by duly licensed physicians or dentists or otherwise dispensed by them in the treatment of patients.

Tenn. Code Ann. § 67-4-702(a)(23). Under the Act, "services" means

every activity, function or work engaged in by a person for profit or monetary gain, except as otherwise provided in this part. Services for profit or monetary gain does not include services rendered by a person for an affiliated business entity; provided, that the services are accounted for as allocations of cost incurred in providing the service without any markup whatsoever. "Services" does not include sales of tangible personal property[.]

Tenn. Code Ann. § 67-4-702(a)(21).

Here, the Department classified SAP under Classification 3 and assessed SAP pursuant to Tenn. Code Ann. § 67-4-708(3)(C). Under Tenn. Code Ann. § 67-4-708(3)(C), "making sales of services or engaging in the business of furnishing or rendering services" is a taxable privilege unless the activity falls within one of the sixteen enumerated services that are exempt from taxation. The Department determined that SAP's activities are taxable under Tenn. Code Ann. § 67-4-708(3)(C) after finding that SAP is "in the business of selling computer software, cloud services, software consulting services, software programming services, configuration services and training classes."

According to the Department, SAP's sales of software, Cloud Hosting, and Cloud-Based Services fall within the Act's definition of "services" because the definition is so broad that "virtually any activity or work engaged in for profit or monetary gain is taxable, unless otherwise excepted under the Act." Our task then is to determine whether the three areas of SAP's business at issue here constitute taxable "services" under the Act. We will address each in turn.

A. Software sales

The trial court concluded that SAP's sales of its software were not taxable under the Act because they did not constitute sales of "services," but rather, sales of intangible personal property. The court based its conclusion on the Tennessee Supreme Court's decision in *Commerce Union Bank v. Tidwell*, 538 S.W.2d 405 (Tenn. 1976). In that case, the Department assessed sales and use tax on a taxpayer's sales of computer software. *Id.* at 406. The software at issue in *Commerce Union* involved applical programs that, like SAP's software, were "designed to perform specific functions, such as preparation of

the employee payroll, preparation of a loan amortization schedule, or any other specific job which the computer is capable of performing." *Id.* Also like SAP's software, some of the software programs could "be modified to fit the peculiar application of the individual user, while others [were] unique." *Id.* The taxpayer's software programs could be installed on the customer's computer "by a remote programming terminal located miles from the user's computer, with the input information transmitted by telephone" or "by punch cards, magnetic tapes or discs, containing the program developed by the vendor." *Id.* at 406-07. The taxpayer also often "provide[d] manuals, services, and consultation designed to instruct the user's employees in the installation and utilization of the supplied program." *Id.* at 407.

The *Commerce Union* Court was required to determine whether the computer programs were subject to sales and use tax as sales of tangible personal property. *Id.* at 406. The definition of "tangible personal property" applied by the *Commerce Union* Court, like the definition of that term in the Business Tax Act, included "'personal property, which may be seen, weighed, measured, felt, or touched, or is in any other manner perceptible to the senses.'" *Id.* (quoting Tenn. Code Ann. § 67-3002(l)). The Department asserted that the software programs were tangible personal property because they were "analogous to the purchase of a phonograph record or the purchase or lease of a motion picture film," which the Court had previously held were taxable tangible personal property. *Id.* at 407; *see also Crescent Amusement Co. v. Carson*, 213 S.W.2d 27, 29 (Tenn. 1948). The taxpayer contended that, "while the intellectual processes may be embodied in tangible and physical material, such as punch cards and magnetic tapes, the logic or intelligence of the program is an intangible property right; and it is this intangible property right which is acquired when computer software is purchased or leased." *Com. Union*, 538 S.W.2d at 407.

The *Commerce Union* Court agreed with the taxpayer, stating in pertinent part, as follows:

> The examples given in the Crescent case differ from the situation in the case at bar in that no product is created. What is created and sold here is information, and the magnetic tapes which contain this information are only a method of transmitting these intellectual creations from the originator to the user. It is merely incidental that these intangibles are transmitted by way of a tangible reel of tape that is not even retained by the user.
> . . .
> When the information is transferred from the tape to the computer, the tape is no longer of any value to the user; and it is not retained in the possession of the user. The information on the tape, unlike the phonograph record, is not complete and ready to be used at the time of its purchase. It must be translated into a language understood by the computer. Once this information has been translated and introduced into the computer and the tapes returned or the punch cards destroyed, what actually remains in the

computer is intangible knowledge; this is what was purchased, not the magnetic tapes or punch cards. Transfer of tangible personal property under these circumstances is merely incidental to the purchase of the intangible knowledge and information stored on the tapes.

*Id.* at 407-08 (citations omitted). Thus, the Court held that the sale of computer software did not constitute the sale of tangible personal property for the purposes of sales and use tax. *Id.* at 408.

The Department presents several arguments for why it believes the trial court erred in relying on the holding in *Commerce Union* to conclude that SAP's sales of computer software constituted intangible personal property and were, therefore, not taxable under the Act. The Department first argues that the trial court should not have relied on the holding in *Commerce Union* because it has been abrogated by the General Assembly. After the Court's decision in *Commerce Union*, the General Assembly amended the sales and use tax statutory definition of "tangible personal property" to include "prewritten computer software." Tenn. Code Ann. § 67-6-102(45)(A) (2007); *see also* Tenn. Code Ann. § 67-6-102(86)(K) (2022) (changing the definition of "sale" to include "any transfer of title or possession, or both, lease or licensing, in any manner or by any means whatsoever of computer software"). The General Assembly also enacted a separate provision that expressly states that computer software is subject to sales and use tax "regardless of whether the software is delivered electronically, delivered by use of tangible storage media, loaded or programmed into a computer, created on the premises of the consumer or otherwise provided." Tenn. Code Ann. § 67-6-231(a). Based on the many amendments to the sales and use statutes since the *Commerce Union* decision, we agree with the Department that the holding in that case has been legislatively abrogated—as to sales and use tax. As the trial court noted, however, the General Assembly did not make any such changes to the Business Tax Act. Therefore, we cannot conclude that the holding in *Commerce Union* was legislatively abrogated as to the business tax.

The Department next contends that the decision in *State v. Sanders*, 923 S.W.2d 540 (Tenn. 1996), changed the holding in *Commerce Union* by adopting a narrower definition of intangible personal property for sales tax purposes. In that case, the taxpayer sold bars of silver and gold and silver bullion coins. *Id.* at 541. The Department sought to impose sales tax on these transactions as sales of tangible personal property. *Id.* at 542. The taxpayer argued that the transactions were not sales of tangible personal property because he was buying Federal Reserve notes, i.e., dollars, and paying for them with gold and silver. *Id.* In other words, the taxpayer asserted, the transactions were nothing more than "exchanges of money for money," rendering the bars of silver and gold and silver bullion coins intangible personal property. *Id.*

Because Tennessee's tax statutes do not define "intangible personal property," the *Sanders* Court looked to *Black's Law Dictionary* and adopted an entry defining "intangible

property" as "'such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises.'" *Sanders*, 923 S.W.2d at 542 (quoting BLACK'S LAW DICTIONARY 809 (6th ed. 1990)). The Court considered this definition appropriate because it "is consistent with the specific exclusion of 'stocks, bonds, notes, insurance, or other obligations or securities' from the definition of tangible personal property in Tenn. Code Ann. § 67-6-102(28)." *Id.* at 542-43. Applying this definition, the Court concluded that, under the circumstances of the case, the transactions were taxable as sales of tangible personal property because they "were based on the intrinsic value of the precious metals rather than their representative value as a medium of exchange." *Id.* at 543. For instance, the value of the gold and silver was determined by its weight rather than the value assigned by the issuing government. *Id.*

According to the Department, SAP's computer software "does not fit within this [narrower] definition" of "intangible property" and, therefore, the *Commerce Union* holding does not apply. We respectfully disagree. First, the holding in *Sanders* is consistent with the holding in *Commerce Union*. The medium used to transmit the software at issue in *Commerce Union* had no real value apart from the value of the "intangible" features of the software. *See Com. Union*, 538 S.W.2d at 408. Second, when customers purchase SAP's software, what they purchase is the right (or license) to use SAP's software. This right or license is substantially similar to the "copyrights" and "franchises" that the *Sanders* Court expressly identified as intangible property.

The Department next contends that *Commerce Union* is not applicable here because, unlike the sales and use tax statutes at issue in that case, the Business Tax Act is "broad" enough to encompass any activity or work engaged in for monetary gain, i.e., the sale of computer software. As SAP points out, however, this argument is simply a red herring. The Department admitted in its response to SAP's motion for summary judgment that the Act's definition of "services" does not include the "sale of tangible or intangible personal property," and, as discussed at length above, the *Commerce Union* Court's holding that computer software constitutes intangible personal property remains applicable law. Thus, the only way that the Act's definition of "services" could be "broad" enough to alter the result from *Commerce Union* is if that definition specifically included computer software or made intangible personal property taxable. The Act's definition of "services" does neither.

The Department's final argument on this issue is that the trial court erred in relying on the *Commerce Union* holding because the SIC Index, referenced by the Act, classifies sales of computer software as "services" rather than as sales of intangible personal property. SAP asserts that the Act only mentions the SIC Index for one purpose: determining whether the exemptions set forth in Tenn. Code Ann. § 67-4-708(3)(C)(i)-(xvi) apply, which "forecloses the Department's attempt to use the SIC for other purposes."

The Department made a similar argument in *Auto Glass Co. of Memphis Inc. v. Gerregano*, 596 S.W.3d 257 (Tenn. Ct. App. 2019). In that case, the taxpayer had filed its business tax returns under Classification 1(B), which encompasses persons making sales of glass, since the 1970s. *Id.* at 259. The Department audited the taxpayer for the time period 2011-2014 and decided that the taxpayer should be reclassified as a seller of services under Classification 3(C). *Id.* According to the Department, the taxpayer should have been classified "under Classification 3(C) as a seller of services because, under the [SIC] Index, it would be considered an 'automotive glass replacement shop,' which is classified thereunder as a service." *Id.* at 264 n.5. This Court disagreed and considered the SIC Index's classification irrelevant under the circumstances of the case. As we explained,

> [a]lthough the Commissioner argues that the Business Tax Act refers to and adopts the classifications set forth in the [SIC] Index, it should be noted that the index is referenced in the context of determining exceptions under Classification 3(C). Indeed, the statute wherein Classification 3(C) is codified provides as follows: "It is the legislative intent that the exceptions in subdivisions 3(C)(i)-(xvi) shall include the sales of services by those businesses or establishments so described in the Standard Industrial Classification Index[.]"

*Id.* (quoting Tenn. Code Ann. § 67-4-708(3)(C)). In other words, the SIC Index applies for the sole purpose of determining whether a business's activities fall within one of the Classification 3(C) exemptions set forth in Tenn. Code Ann. § 67-4-708(3)(C)(i)-(xvi). Because none of those exemptions are at issue here, the SIC Index is irrelevant to the issue of whether SAP's sales of computer software constitute sales of intangible personal property.

For the foregoing reasons, we conclude that the trial court correctly determined that the Business Tax Act does not apply to the gross receipts derived from SAP's sales of its computer software because, under the *Commerce Union* holding, they constitute sales of intangible personal property.

B. Cloud Hosting sales

The next issue raised by the Department pertains to SAP's Cloud Hosting sales. As previously discussed in this opinion, SAP's Cloud Hosting offering provides access to SAP's servers or hardware infrastructure so that customers that have purchased SAP's software can deploy, manage, and run the software on SAP's hardware, or gain access to processing, storage, or networking solutions using SAP's software platform. Essentially, SAP's Cloud Hosting customers purchase the ability to use SAP's infrastructure on a subscription basis.

The Department argues that the trial court should have concluded that the Cloud Hosting sales constituted sales of services under the Act. In response, SAP argues that its Cloud Hosting sales "should be treated as the leasing of property" rather than the sale of services because the primary purpose of the activity is the leasing of tangible hardware and server equipment, or intangible software platforms that are never delivered to a lessee in Tennessee. Thus, SAP argues, the Cloud Hosting sales are not subject to taxation under the Act. *See* TENN. COMP. R. & REGS. 1320-04-05-.24(1) (stating that the Business Tax "shall apply to all leases of tangible personal property delivered to a lessee or rentee in this state").

To determine whether a transaction is encompassed by taxation statutes, the courts of this state apply the "true object" test. This Court explained that test as follows:

> Recognizing that undertakings do not always fit clearly and indisputably within the discrete categories contemplated by taxation laws, the courts of this state have developed a method whereby judicial inquiry is made into the "primary purpose" or "true object" of the activity or business at issue. For instance, in deciding whether a gondola and chair lift at the 1982 World's Fair in Knoxville constituted a means of transportation or rather an amusement ride, our Supreme Court examined the facts surrounding its design and use to determine its primary function. *Sky Transpo, Inc. v. City of Knoxville*, 703 S.W.2d 126, 129 (Tenn. 1985). Although Justices Harbison and Drowota disagreed with the Court's ultimate conclusion that the gondola and lift did not constitute a taxable amusement, they did not take issue with the majority's methodology. *See id.* at 132-33 (Harbison, J., concurring in part and dissenting in part).
>
> Likewise, in *Commerce Union Bank v. Tidwell*, 538 S.W.2d 405 (Tenn. 1976), the Supreme Court declined to extend the sales tax on tangible personal property to the purchase of computer programs. *See id.* at 408. The Court concluded that the transfer of the tangible instantiations of the programs (i.e., magnetic tapes and punch cards) was "merely incidental" to the true object of the sale, which was the transfer of information, an intangible. *Id.* at 407.

*Qualcomm Inc. v. Chumley*, No. M2006-01398-COA-R3-CV, 2007 WL 2827513, at *4-5 (Tenn. Ct. App. Sept. 26, 2007). Here, the trial court applied the true object test and concluded that "[t]he true object or primary purpose of the Cloud Hosting is to utilize SAP's hardware or server equipment that the customer would otherwise have to purchase to store, maintain, and deploy SAP's software." Thus, the trial court found that the Cloud Hosting sales were "tantamount to the leasing of tangible computer or server equipment that is exempt from taxation under the Business Tax."

We respectfully disagree with the trial court's finding. A lease generally grants "the possession and use of (land, buildings, rooms, movable property, etc.) to another in return

- 12 -

for rent or other consideration." *Lease*, BLACK'S LAW DICTIONARY (12th ed. 2024). As this Court has previously explained, "[t]he key to the formation and definition of a lease is the conveyance of a possessory interest . . . . A lease 'grants the lessee . . . control over the property against the lessor and all the world.'" *Doramus v. Rogers Grp., Inc*. No. M1998-00918-COA-R3-CV, 2001 WL 196974, at *8 (Tenn. Ct. App. Feb. 28, 2001) (quoting *Solderholm v. Chi. Nat'l League Ball Club*, 587 N.E.2d 517, 520 (Ill. App. Ct. 1992)). Therefore, "'it is the transfer of absolute control and possession of property at an agreed rental which differentiates a lease from other arrangements dealing with property.'" *Id.* at *8-9 (quoting *Davis v. Dinkins*, 585 N.Y.S.2d 978, 981 (N.Y.Sup. Ct. 1992)). Although SAP's Cloud Hosting customers used SAP's hardware or server equipment or software platform on a subscription basis, the record contains no evidence that SAP transferred control or possession of the equipment or software platform to those customers. Indeed, SAP's own regional vice president, Amy Spruill, testified that SAP manages the infrastructure behind the software platform, and SAP repeatedly emphasized before the trial court and this Court that none of its hardware or server equipment is delivered to or located in Tennessee. SAP's Cloud Hosting sales, therefore, are not tantamount to leases.

Somewhat confusingly, SAP contends that, even if the Cloud Hosting sales were not leases, they were not subject to tax under the Act because "as explained above, Business Tax does not apply to gross receipts from intangible software." We understand this argument to be that the software platform is the same as SAP's software that is considered intangible personal property. The Cloud Hosting sales, however, are not sales of licenses to use intangible computer software. Rather, the true object or primary purpose of SAP's Cloud Hosting transactions is to provide or grant customers access to and use of SAP's hardware, servers, and/or software platform so that customers can run the software they licensed from SAP without having to also purchase and manage their own data center. Stated another way, the true object of this activity is providing or granting access to SAP's infrastructure. Providing or granting access to use infrastructure does not transfer intangible knowledge, and it is not merely a representative or evidence of value. Therefore, it does not constitute intangible personal property under *Commerce Union* and *Sanders*. Such access also does not constitute tangible personal property under the Act because it cannot be "seen, weighed, measured, felt or touched[.]" Tenn. Code Ann. § 67-4-702(a)(23). Providing or granting access to infrastructure, however, is an "activity, function, or work engaged in . . . for profit or monetary gain," making it a service under the Act. Tenn. Code Ann. § 67-4-702(a)(21). We reverse the trial court's decision that SAP's Cloud Hosting sales constituted non-taxable leases of tangible personal property outside of Tennessee.

SAP contends that, even if its Cloud Hosting sales constitute sales of services, "Tennessee Business Tax would still not apply because the sales of Cloud Hosting [are] conducted wholly outside of Tennessee and not 'delivered' into Tennessee." SAP makes this same argument in regard to the trial court's conclusion that SAP's sales of Cloud-Based Services were subject to taxation under the Act. For the reasons discussed in Section

C below, we reject SAP's argument. We, therefore, conclude that the Department is entitled to summary judgment on this issue.

## C. Cloud-Based Services sales

SAP does not dispute that its sales of Cloud-Based Services constitute services under the Act, but it contends that the gross receipts from those sales, and the Cloud Hosting sales, are not subject to business tax because the services were not delivered in Tennessee as required by the Act. Specifically, SAP's argument is that nothing was physically delivered to a location in Tennessee and no SAP employees traveled to Tennessee to perform these services. Instead, SAP argues, it provided the services remotely at locations outside of Tennessee. Though not physically delivered to any location in Tennessee, the Department argues that these services were subject to business tax because they were electronically delivered to Tennessee businesses, a method of delivery allowed for by the Act.

Prior to 2016, out-of-state businesses that sold services in Tennessee were subject to business tax if the service was performed in Tennessee. Tenn. Code Ann. § 67-4-717(a)(1) (2015). The General Assembly amended Tenn. Code Ann. § 67-4-717 in 2016, however, to provide that out-of-state businesses are subject to business tax if they sell services that are "delivered to a location in this state." Tenn. Code Ann. § 67-4-717(a)(1)(B). The term "deliver" is not defined in the statute or elsewhere in the Act. Therefore, we must look to the term's "natural and ordinary meaning" in light of "the statute's plain language in its normal and accepted use." *Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 602 (Tenn. 2013).

*Black's Law Dictionary* defines "delivery" as "[t]he formal act of voluntarily transferring something; esp., the act of bringing goods, letters, etc. to a particular person or place." *Delivery*, BLACK'S LAW DICTIONARY (11th ed. 2019). *Merriam-Webster* defines "deliver" as "to take and hand over to or leave for another" and "to send, provide, or make accessible to someone electronically." *Deliver*, Merriam-Webster, https://www.merriam-webster.com/dictionary/deliver (Last visited Apr. 23, 2026). As these definitions show, the plain and ordinary meaning of "deliver" includes services where something is physically transferred to a particular place and where something is made accessible to someone electronically. SAP made its hardware and servers, software platform, and Cloud-Based Services accessible to its customers electronically in Tennessee. Delivery, therefore, was completed when SAP's customers electronically accessed these services from their places of business in Tennessee.

The Department relied on the "ship to" addresses on SAP's invoices to determine that Tennessee businesses received access to Cloud Hosting and Cloud-Based Services in this state. SAP asserts that the Department improperly relied on the "ship to" addresses because they "do not paint an accurate picture" of where any of the services were accessed.

According to SAP, its customers could be accessing these services from "anywhere, and SAP has no way of knowing their location with any accuracy." We reject this argument. The General Assembly enacted a statute that requires all "entities subject to any tax administered by the commissioner" to "keep and preserve suitable records from which the taxpayer and the commissioner can determine the Tennessee tax liability, if any." Tenn. Code Ann. § 67-1-113(a). "Any taxpayer who fails to comply with this section shall be assessed taxes, plus any applicable penalty and interest based on the best information available to the department; and the burden shall be on the taxpayer to show by clear and cogent evidence that the assessment is incorrect." Tenn. Code Ann. § 67-1-113(b). Further, tax assessments are presumed "'valid and the burden is on the taxpayer to prove that they are erroneous.'" *Edmondson Mgmt. Serv., Inc. v. Woods*, 603 S.W.2d 716, 717 (Tenn. 1980) (quoting *Howard v. United States*, 566 S.W.2d 521, 528 (Tenn. 1978)).

Given that the "ship-to" addresses in SAP's own records indicate that the Cloud Hosting and Cloud-Based Services were delivered to locations in Tennessee, SAP's vague assertion that those records "do not paint an accurate picture" of the locations of the businesses that received access to SAP's infrastructure is not enough. *See id.* at 718 (stating that a taxpayer's "[v]ague allegations . . . to the effect that the Department's method of ascertaining the taxes due from him was incorrect are not sufficient to carry the taxpayer's burden"). SAP may not have "shipped" anything to the "ship-to" addresses identified on the invoices, but those addresses were the best information available to the Department for identifying the location of the businesses receiving access to SAP's infrastructure. Tenn. Code Ann. § 67-1-113(b). As such, it was reasonable for the Department to assume that businesses accessed SAP's infrastructure at those addresses. *See, e.g., Parikh v. Schmidt*, 157 N.Y.S.3d 603, 607-08 (N.Y. App. Div. 2021) (holding that it was reasonable for the Department of Taxation and Finance to rely on "ship to" addresses "to assume that installation services and premeasurement services would occur at the purchaser's location . . . such that invoice charges for those services were taxable"). The possibility that customers could be accessing SAP's infrastructure from "anywhere" is nothing more than that—a possibility. It does not amount to "clear and cogent evidence" that SAP's customers are not, in fact, accessing SAP's infrastructure from the "ship-to" addresses identified on the invoices. Tenn. Code Ann. § 67-1-113(b). Because SAP produced no evidence that the Tennessee businesses listed on the invoices did not access SAP's Cloud Hosting and Cloud-Based Services from the locations identified on the invoices, we conclude that the Department properly included these gross receipts in its calculation of SAP's business tax assessment.

In sum, we affirm the trial court's determination that SAP's software sales constitute sales of intangible personal property under *Commerce Union* and are, therefore, not subject to business tax under the Act. Both SAP's Cloud Hosting and Cloud-Based Services sales are taxable under the Act because they constitute sales of services delivered to locations in Tennessee. Our conclusion that SAP's gross receipts from its Cloud Hosting sales were properly included in the business tax assessment changes the amount of the tax that is

finally assessed or denied. Thus, we must vacate the trial court's award of attorney's fees to SAP under Tenn. Code Ann. § 67-1-1308(d). The case is remanded for the trial court to: (1) enter an order granting summary judgment to the Department on the issue of SAP's Cloud Hosting sales, (2) determine whether SAP is still the prevailing party under the statute, and, if so, (3) recalculate the award now that the amount of business tax finally assessed includes both the Cloud Hosting and Cloud-Based Services sales.[3] Because we are vacating the trial court's award of attorney's fees, the Department's argument relating to that issue is pretermitted.

CONCLUSION

The judgment of the trial court is affirmed in part, reversed in part, and vacated in part. The case is remanded for further proceedings consistent with this opinion. Costs of this appeal are assessed equally against the parties, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

[3] The trial court stated that, "[o]f the $485,061 in Business Tax assessed, not including penalties and interest, $43,154.83 was associated with SAP's Cloud-Based Services." It is unclear from the record before us how much of the remaining $441,906.17, not including penalties and interest, was associated with SAP's Cloud Hosting services.